**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Linda Lorraine Sorber, | No. CV-17-08198-PCT-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Linda Lorraine Sorber seeks judicial review of the decision of the Commissioner of Social Security (the "Commissioner") denying her application for benefits under the Social Security Act (the "Act"). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1. For the following reasons, the Court reverses the Commissioner's decision and remands for a determination of benefits.

**I.  Procedural Background**

On March 11, 2013, Plaintiff applied for social security disability insurance and supplemental security income benefits under the Act. (Tr. 13, 47.)[1] After the Social Security Administration ("SSA") denied Plaintiff's initial application and her request for reconsideration, she requested a hearing before an administrative law judge ("ALJ"). (Tr. 13.)  After conducting a hearing, on February 18, 2016, the ALJ issued a decision

---
[1] Citations to "Tr." are to the certified administrative record. (Doc. 14.)

finding Plaintiff not disabled under the Act. (Tr. 23-26.) On July 16, 2017, the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**II. Administrative Record**

The record before the Court establishes the following history of diagnoses and treatment related to Plaintiff's impairments, including degenerative disc disease, cervical and lumbar spondylosis, Meniere's disease/vestibular migraines, osteopenia, and chronic pain syndrome. (Tr. 15.) The record also includes several medical opinions.

    **A. Relevant Treatment History**

        **1. Treatment for Meniere Disease, Dizziness, and Headaches**

In 2012, Plaintiff began seeing Terrance J. Kwiatkowski, M.D., for dizziness and headaches. (Tr. 513-14.) In August 2012, Dr. Kwiatkowski performed surgery for "left Meniere disease with endolymphatic hydrops." (Tr. 508.) In November 2012, Plaintiff had surgery for "left serous otitis media with eustacian tube dysfunction." (Tr. 493.) Plaintiff's dizziness and headaches persisted and in November 2012 Dr. Kwiatkowski noted that Plaintiff had been "spinning" since the night before her appointment. (Tr. 487-88.) In December 2012, Plaintiff presented to the emergency room with dizziness. (Tr. 425-30.)

During a January 2013 appointment with Dr. Kwiatkowski, Plaintiff reported "left ear was full/dizzy/hard to walk/unsteady/feels strange/imbalanced. [No] spinning today. Constant dizziness." (Tr. 484.) At a March 2013 appointment, Plaintiff reported "room spinning [for] 1 week." (Tr. 481.) In April 2013, Dr. Kwiatkowski noted that Plaintiff reported dizziness and that the "room spins." (Tr. 787-88.) In May 2013, Plaintiff complained of unsteadiness. (Tr. 706.) Dr. Kwiatkowski noted that "balance therapy is critical for her problem and that in addition to her Meniere's disease her benign paroxysmal positional vertigo is a huge issue with her as is her eustacian tube dysfunction . . . which has gotten worse with time despite[] lack of true spinning vertigo." (*Id.*) Dr. Kwiatkowski opined that Plaintiff had "multifactorial balance disorder benign positional vertigo

Meniere's disease and left eustacian tube dysfunction." (Tr. 702.) Dr. Kwiatkowski recommended that Plaintiff attend balance therapy as many times as possible. (Tr. 707.) Two weeks later, Dr. Kwiatkowski tested Plaintiff's dizziness with several physical maneuvers, and noted her dizziness was improving, but "during the [Epley] maneuver she does spin." (Tr. 702.)

In May 2013, Plaintiff went to the emergency room with dizziness that was not relieved by medication. (Tr. 560.) In May and June 2013, Plaintiff had several balance therapy appointments. (Tr. 552.) Upon discharge, physical therapist David Lowe stated that Plaintiff's "vertigo is not improving despite manual therapy (cannalith repositioning), clinical balance retraining, [and] daily home Epley maneuvers." (*Id.*) In July 2013, Dr. Kwiatkowski removed Plaintiff's left ear tube, and suggested she may have temporomandibular joint ("TMJ") disorder. (Tr. 699.) He noted that Plaintiff had continued unsteadiness. (*Id.*) In July 2013, an MRI of Plaintiff's brain revealed that Plaintiff had left-sided mastoiditis and alteration of deep white matter in the frontal lobes, suggesting possibly mild ischemic changes, migraine, or vasculitis. (Tr. 596.)

In July 2013, neurologist M.A. Nayer, M.D., noted that Plaintiff had intermittent dizziness that worsened with changes in position or standing, and tinnitus and hearing impairment on the left side. (Tr. 750.) Dr. Nayer observed reduced sensation in Plaintiff's lower extremities and a positive Romberg sign. (*Id.*) Plaintiff went to the emergency room in August 2013 with dizziness and headaches. (Tr. 610-13.) In August 2013, an EEG was normal. (Tr. 759.) During a September 2013 appointment with Dr. Nayer, Plaintiff reported that she was dizzy, sometimes confused and disoriented, felt off balance, had difficulty walking, had bilateral lower extremity pain, difficulty staying asleep, and daytime fatigue. (Tr. 748.) During a November 2013 appointment with Dr. Nayer, Plaintiff reported neck pain that sometimes radiated to her shoulders, impaired sleep because of pain, and continued dizziness. (Tr. 746.) Dr. Nayer observed that Plaintiff had reduced sensation in her lower extremities, reduced proprioception, and a positive Romberg sign. (*Id.*)

During a January 2014 appointment with Dr. Kwiatkowski, Plaintiff reported vertigo, ear pain, and worsening spinning sensations. (Tr. 695.) Plaintiff had two physical therapy appointments in March and April 2014 and upon discharge the physical therapist noted that home exercise initially "greatly helped" Plaintiff's vertigo, but her symptoms returned. (Tr. 736.) The physical therapist recommended that Plaintiff obtain "a single-point cane for community ambulation." (*Id*.) In April 2014, Plaintiff went to the emergency room with dizziness. (Tr. 726-27.)

In July 2014, Plaintiff had a consultation for vertigo with Ian Crain, M.D., at the Barrow Movement Disorders Clinic. (Tr. 859.) Plaintiff described intermittent but daily room-spinning episodes, which lasted two to three minutes, occurred randomly, and were worsened by movement. (*Id*.) She also had ear fullness, tinnitus, and headaches. (*Id*.) She reported that no previous treatments had been helpful. (*Id*.) Positioning Plaintiff during the examination caused "intense vertigo with lying down that caused her to be very anxious and nauseous." (Tr. 861.) Dr. Crain observed that Plaintiff's "balance was intact," she had a positive Romberg's sign, her tandem gait was abnormal, heel and toe walking was normal, and Plaintiff walked without assistance. (*Id*.) Dr. Crain opined that Plaintiff's "history and exam [were] concerning for vestibular migraines," and prescribed nortriptyline. (Tr. 862.) At a September 23, 2014 visit with Dr. Crain, Plaintiff reported that her symptoms improved for about one month with the new medication, but then returned to baseline and she was experiencing vertigo daily. (Tr. 855.) Dr. Crain observed that Plaintiff's "balance was intact," she had a positive Romberg's sign, her tandem gait was abnormal, heel and toe walking was normal, and Plaintiff walked without assistance. (Tr. 857.) Dr. Crain assessed recurrent vestibular migraines with vertigo and increased the dosage of nortriptyline. (Tr. 858.)

**2.    Treatment for Spinal Impairments and Joint Pain**

In April 2014, Dr. Nayer noted that Plaintiff had ongoing neck pain, disrupted sleep, and dizziness. (Tr. 743.) Dr. Nayer diagnosed cervical spondylosis without myelopathy and prescribed Norco. (Tr. 744.) In August 2014, a cervical spine MRI revealed

generalized degenerative changes of the discs and moderate left-sided narrowing at the C5-6 level. (Tr. 853.) In August 2014, a lumbar spine MRI scan revealed advanced degenerative changes of the lumbar discs with marked disc space narrowing at L4-5, some associated discogenic changes involving vertebral endplates, a small, generalized subligamentous disc protrusion at L4-5, and mild stenosis. (Tr. 854.) In October 2014, Dr. Nayer observed that Plaintiff had a positive Romberg sign, and decreased lower extremity sensation and proprioception. (Tr. 875-76.) In October 2014, a lower extremity electromyography showed no evidence of lumbar radiculopathy or neuropathy. (Tr. 877.)

In January 2015 Plaintiff had lumbar medial branch nerve blocks. (Tr. 914-15.) In February 2015, Plaintiff had cervical medial branch nerve blocks. (Tr. 905-06.) During a February 2015 appointment, Dr. Nayer observed that Plaintiff had decreased sensation in her lower extremities and a positive Romberg sign. (Tr. 873.) Between October 2014 and February 2015, Plaintiff had physical therapy for neck and back pain. (Tr. 878-97.) Treatment notes from February 2015 indicate that Plaintiff had stiffness in her cervical spine but completed her exercises without fatigue and that she had pain with rotation. (Tr. 878-79.)

Mary Janikowski, D.O., and other providers from the Tri State Pain Institute treated Plaintiff for facial pain/TMJ dysfunction, spine pain, joint pain, and limb pain in 2014 and 2015. (Tr. 898-99.) In 2014, Dr. Janikowski noted that Plaintiff reported pain in her cervical spine, shoulders, arms, face, and lumbar spine, and that she complained of headaches. (Tr. 965-72, June 2014; Tr. 958-64, July 2014; Tr. 951-57, August 2014; Tr. 942-48, September 2014; Tr. 934-40, October 2014; Tr. 927-33, November 2014; Tr. 920-26, December 2014.) In 2015, Dr. Janikowski observed that Plaintiff had ongoing symptoms of cervical muscle tenderness, increased pain in her cervical and lumbosacral spine with movement or positions (flexion, extension, and bilateral bending), positive facet loading, lumbar spine muscle tenderness, and increased pain with range of motion. (Tr. 1012, 1019, 1027, 1035, 1042, 1049, 1059, 1066.)

/ / /

**B. Opinion Evidence**

**1. State Agency Reviewing Physicians**

As part of the state agency initial determination in November 2013, Ernest Griffith, M.D., reviewed the record and completed a residual functional capacity ("RFC") assessment. (Tr. 87-89, 104-05.) He assessed Plaintiff with the physical ability to perform light exertional activities, with an unlimited ability to climb ramps or stairs, the ability to occasionally climb ladders, ropes, or scaffolds, and the need to avoid "concentrated exposure" to fumes, odors, dusts, gases, poor ventilation, and hazards such as "machinery, heights, etc." (Tr. 87-89, 104-05, duplicates for SSDI and SSI claims.)

In June 2013, as part of the reconsideration determination, John Kurtin, M.D., completed an RFC assessment and made findings identical to those of Dr. Griffith. (Tr. 124-26, 143-45; *compare* Tr. 88 and 104 *with* Tr. 125 and 144.)

**2. Treating Physicians**

In January 2014, Dr. Kwiatkowski completed a Medical Assessment of Ability to Do Work Related Physical Activities. (Tr. 687.) Dr. Kwiatkowski noted that Plaintiff had "Dizziness—Complicated Meniere's Disease," with five episodes of dizziness per day, lasting up to five minutes, that were decreased by rest with either reclining or lying down. (*Id*.) Dr. Kwiatkowski also opined that Plaintiff had "total limitation" in exposure to unprotected heights, and moderate limitations in being around moving machinery, exposure to marked changes in temperature or humidity, driving automotive equipment, and exposure to dust, fumes, and gases. (Tr. 688.)

In April 2015, Dr. Janikowski completed an assessment of Plaintiff's physical work-related abilities. (Tr. 1002.) Dr. Janikowski opined that Plaintiff could sit for less than three hours and stand or walk for less than two hours in an eight-hour workday. (*Id*.) Dr. Janikowski opined that Plaintiff needed ten to fifteen-minute rest periods and stated that, "sometimes [patient] has to lie down up to 4 to 6 times a day." (*Id*.) Dr. Janikowski opined that Plaintiff's "moderately severe" pain, fatigue, dizziness, and headaches that would cause Plaintiff to be "[o]ff task 16-20% of an 8-hour work day." (Tr. 1003.)

Dr. Janikowski also opined that Plaintiff's impairments would cause her to miss six or more days of work per month. (*Id.*) In November 2015, Dr. Janikowski completed another assessment and found that Plaintiff had the same physical limitations that she had in April 2015. (Tr. 1095-96.)

**III.    Administrative Hearing Testimony**

During the administrative hearing, Plaintiff testified that she was unable to work due to dizziness, Meniere's disease, and back pain. (Tr. 49.) Plaintiff testified that during a typical day she experienced dizziness that affected her balance when she walked or stood up. (*Id.*) Plaintiff's dizziness was triggered by "sudden movements of [her] head, lying flat down, bending over and looking up suddenly." (*Id.*) Plaintiff tried to avoid those types of movements, but her dizziness still occurred. (*Id.*) When Plaintiff experienced dizziness she had to sit down, try to relax, close her eyes, and take deep breaths for twenty to thirty minutes. (*Id.*) Plaintiff testified that she experienced bouts of dizziness, followed by rest periods, about four to five times per day. (Tr. 50.) The dizziness varied in intensity and severity, with little warning prior to its onset. (*Id.*) Plaintiff testified that none of the treatments for her dizziness had provided lasting relief. (Tr. 51-52.)

Plaintiff testified that she also had pain in her neck, shoulders, lower back, and pain that radiated into the left leg. (Tr. 53.) To relieve pain, Plaintiff sat in a reclining chair every day for twenty to thirty minutes at a time. (Tr. 53-54, 55, 56.) Medications and injections had not provided lasting relief for Plaintiff's pain. (Tr. 55.)

Plaintiff testified that she tried to, but could not always, help with household chores including folding laundry and making the bed. (Tr. 52, 56-57.) Plaintiff testified that she did not drive and, therefore, she only went grocery shopping with her husband. (Tr. 52, 56-57.) Plaintiff testified that she walked the family's Chihuahua three or four houses down the street. (Tr. 57-58.) Plaintiff used a cane prescribed by her physical therapist to help with balance. (Tr. 62-63.)

The vocational expert ("VE") testified that Plaintiff had past relevant work as a housekeeper, which required light exertional physical abilities. (Tr. 70.) In response to a

question from the ALJ, the VE testified that a person who could perform light exertional activities, but who should avoid ladders, ropes, scaffolds, moving machinery and hazards, and who could occasionally climb ramps and stairs, could perform Plaintiff's past relevant work as a housekeeper. (Tr. 71.) The VE testified that an individual who would be off-task more than ten percent of a work day could not perform that job. (*Id*.) The VE also testified that a person with the sitting, standing, and walking limitations that Dr. Janikowski assessed would be unable to perform any work. (*Id*.; *see* Tr. 1002, 1095-96.) The VE also testified that a person with limitations consistent with Plaintiff's symptom testimony, including the need to rest for twenty to thirty minutes about five times a day, would be unable to perform any work. (Tr. 71; *see* Tr. 50-51.)

## IV. The ALJ's Decision

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for SSI benefits).[2] To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

### A. The Five-Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her medically impairment or combination of impairments is severe. 20 C.F.R. §§ 404.1520(b) and (c), 416.920(b) and (c). If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five. At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R.

---

[2] The definition of disability is the same for SSDI and SSI benefits. *See Diedrich v. Berryhill*, 874 F.3d 634, 637 (9th Cir. 2017). Therefore, the Court does not always include parallel citations when citing the relevant regulations. *See e.g.*, 20 C.F.R. §§ 404.1520 (SSDI), *id*. § 416.920 (SSI).

- 8 -

§ 404.1520(a)(4)(iii); 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is presumptively disabled. If not, the ALJ determines the claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past relevant work. 20 C.F.R. §§ 404.1520(f); 416.920(f). If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant numbers in the national economy, considering the claimant's RFC, age, work experience, and education. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B. The ALJ's Application of the Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date, January 19, 2014. (Tr. 15.) At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease, cervical and lumbar spondylosis, Meniere's disease/vestibular migraines, osteopenia, and chronic pain syndrome (20 CFR 404.1520(c) and 416.920(c))." (*Id.*) The ALJ found Plaintiff did not have an impairment or combination of impairments and that met or medically equaled the severity of a listed impairment. (Tr. 17.)

The ALJ found that Plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)." (Tr. 18.) The ALJ clarified that Plaintiff could "never climb ladders, ropes, or scaffolds and [could] occasionally climb ramps and stairs." (*Id*.) The ALJ stated that Plaintiff could "perform frequent posturals" but could not "tolerate exposure to hazards or moving machinery." (*Id*.) The ALJ concluded that Plaintiff could perform her past relevant work as a housekeeper. (Tr. 25.) Therefore, the ALJ concluded that Plaintiff was not under a disability as defined in the Act from the alleged onset date, January 19, 2014, through the date of her decision. (*Id*.) Therefore, the ALJ denied Plaintiff's applications for benefits. (Tr. 26.)

**V.     Standard of Review**

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).

In determining whether substantial evidence supports a decision, the court considers the whole record and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted). The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

The court applies the harmless error doctrine when reviewing an ALJ's decision. Thus, even if the ALJ erred, the decision will not be reversed if the error is "inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error "does not negate the validity of the ALJ's ultimate conclusion"); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (stating that "[a] decision of the ALJ will not be reversed for errors that are harmless.").

## VI. Plaintiff's Claims

Plaintiff asserts that the ALJ erred by (1) rejecting the opinions of Plaintiff's treating physicians, and (2) rejecting Plaintiff's symptom testimony without providing clear and convincing reasons supported by substantial evidence in the record. (Doc. 16 at 1.) Plaintiff asserts that these errors were harmful because the vocational expert testified that work would be precluded based on this evidence. The Commissioner asserts that the ALJ's decision is free of harmful error. (Doc. 17.)

### A. Medical Source Opinion Evidence

In weighing medical source opinion evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is given to a treating physician's opinion. *Id.* The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion. *Id.*; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than opinions from treating or examining physicians. *Lester*, 81 F.3d at 831. Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with

the record as a whole; [and] the specialty of the physician providing the opinion. . . ." *Orn*, 495 F.3d at 631.

### B. Treating Physicians' Opinions

Plaintiff argues that the ALJ erred by assigning little weight to Dr. Janikowski's opinion and by ignoring a portion of Dr. Kwiatowski's opinion. As set forth below, the Court agrees that the ALJ erred by assigning little weight to Dr. Janikoswki's opinion. The Court does not resolve whether the ALJ erred in her assessment of Dr. Kwiatowski's opinion.

#### 1. The ALJ Erred by Discounting Dr. Janikowski's Opinion

In April 2015, Dr Janikowski opined that Plaintiff could sit for less than three hours and stand or walk for less than two hours in an eight-hour workday. (Tr. 1002.) Dr. Janikowski opined that Plaintiff required ten to fifteen-minute rest periods and stated that Plaintiff "sometimes" had "to lie down up to 4 to 6 times a day." (*Id*.) Dr. Janikowski opined that pain, fatigue, dizziness, and headaches, at a moderately severe level, would cause Plaintiff to be "[o]ff task 16-20% of an 8-hour work day." (Tr. 1003.) Dr. Janikowski also opined that Plaintiff would be expected to miss six or more days of work per month because of her impairments. (*Id*.) In November 2015, Dr. Janikowski completed another assessment that found the same limitations. (Tr. 1095-96.) The ALJ gave this opinion "very little weight" because the ALJ concluded that it was inconsistent with the record which reflected that Plaintiff was "not so significantly limited" and that her "balance was found to be intact." (*Id*.)

To support her conclusion that Plaintiff was "not so significantly limited," the ALJ cited evidence that Plaintiff had degenerative changes in the lumbar and cervical spine but noted that "electrodiagnostic testing showed no radiculopathy or peripheral neuropathy." (*Id*. (citing Admin. Hrg. Exs. 38F at 1; 41F at 5; 46F at 5).) The ALJ also cited a treatment record from April 2015, which reflected that Plaintiff "had no spasms, normal range of motion, and normal muscle strength and tone." (Tr. 24 (citing Admin. Hrg. Ex. 46F at 48-

61).)³ The ALJ, however, did not acknowledge that that treatment notes also indicated that Plaintiff had cervical muscle tenderness, increased pain with cervical range of motion, lumbar muscle tenderness, and increased pain with lumbar range of motion. (Tr. 1055, 1066); *see Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2017) (stating that the ALJ must avoid "cherry-picking" from an evidentiary record). Additionally, the ALJ did not identify which of Plaintiff's limitations, that Dr. Janikowski assessed, she was discounting based on the absence of objective evidence of radiculopathy or peripheral neuropathy or based on the April 2015 treatment record. (Tr. 24.)

The ALJ noted that Plaintiff complained of vertigo and that she "was noted to have either Meniere's disease or vestibular migraines." (*Id*.) The ALJ, however, discounted Dr. Janikowski's opinion because she concluded that the record showed that Plaintiff's balance was intact. (Tr. 24 (citing Admin. Hrg. Ex. 39F at 1-8).)⁴ The treatment notes the ALJ cites indicate that during appointments on July 29 and September 23, 2014, Plaintiff's "balance was intact." (Tr. 857, 861.) However, during those same appointments, Dr. Crain observed that Plaintiff had an "abnormal tandem gait" and a positive Romberg sign. (*Id*.) The ALJ did not explain which portions of Dr. Janikowski's opinion she was rejecting based on the treatment notes that she cited and did not explain why observations that Plaintiff's "balance was intact" during appointments in July and September 2014 were inconsistent with Plaintiff's reports of vertigo due to migraines or Meniere's disease.⁵ (Tr. 24.)

An ALJ may reject a medical opinion when it is "unsupported by the record as a whole." *Batson*, 359 F.3d at 1195; *see Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d

---

³ This exhibit is Dr. Janikowski's April 20, 2015 treatment noted that is located at Tr. 1055-1061

⁴ This exhibit includes Dr. Crain's July and September 2014 treatment notes located at Tr. 855-62.

⁵ "Meniere's disease is a disorder of the inner ear that causes spontaneous episodes of vertigo—a sensation of a spinning motion—along with fluctuating hearing loss, ringing in the ear (tinnitus), and sometimes a feeling of fullness or pressure in your ear." *Bueno v. Comm'r Soc. Sec*., 2014 WL 4471420, at *1, n.3 (E.D. Cal. Sept. 10, 2014) (citing mayoclinic.org/diseases-conditions/menieres-disease/basics/definition/con20028251).

595, 602–03 (9th Cir. 1999) (a medical opinion's inconsistency with the overall record constitutes a legitimate reason for discounting the opinion.) To reject an opinion as inconsistent with the medical record, the "ALJ must do more than offer his conclusions." *Embrey*, 849 F.2d at 421. The ALJ's conclusory assertion that the diagnostic and treatment record did not support the limitations that Dr. Janikowski assessed does not satisfy the standard required for rejecting a treating physician's opinion.[6] *See* 20 C.F.R. §§ 404.1527, 416.927. The ALJ must do more than offer her conclusions. "[Sh]e must set forth [her] own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988); *see also Widmark v. Barnhart*, 454 F.3d 1063, 1069 (9th Cir. 2006). The ALJ did not satisfy this burden. The ALJ did not connect the record evidence that she cited to support her rejection of any particular limitation that Dr. Janikowski identified in her opinions. *See Trevizo v. Berryhill*, 871 F.3d 664, 682 n.10 (9th Cir. 2017) (finding "the absence of medical records regarding alleged symptoms is not itself enough to discredit a claimant's testimony.") Therefore, the ALJ's conclusory assertions do not constitute legally sufficient reasons for discounting Dr. Janikowski's opinion.

### 2. Dr. Kwiatowski's Opinion

In 2014, Dr. Kwiatowski completed an assessment of Plaintiff's ability to perform work-related physical activities. (Tr. 687-88.) He identified Plaintiff's impairment that "limited her ability to perform work related activities" as "dizziness – complicated Meniere's disease." (Tr. 687.) Then, in a section of the assessment labeled "[f]requency per impairment," Dr. Kwiatkowski indicated that Plaintiff experienced dizziness five times per day of "0-5 minutes" in "duration." (*Id.*) Dr. Kwiatowski noted that Plaintiff had "ancillary symptoms" of "vertigo/dizziness." (*Id.*) Dr. Kwiatkowski indicated that "stress" and "lack of sleep" "increase[d] symptoms" and that "rest (with reclining and/or lying down)" "decrease[d] symptoms. (*Id.*) On the next page of the assessment

---

[6] The agency has amended regulations for evaluating medical evidence, but the amended regulations (in pertinent part) only apply to claims filed on or after March 27, 2017, and therefore are not relevant to this case. *See* 20 C.F.R. § 404.1527 (applicable to claims filed before March 27, 2017); § 404.1520c (applicable to claims filed after March 27, 2017).

Dr. Kwiatkowski addressed whether Plaintiff had "[r]estrictions in [certain] activities." (Tr. 688.) Dr. Kwiatowski indicated that Plaintiff was totally restricted in activities involving unprotected heights, and moderately restricted in activities involving moving machinery, marked changes in humidity and temperature, driving automotive equipment, and exposure to dust, fumes, and gases. (*Id.*)

The ALJ afforded Dr. Kwiatowski's opinion only "partial weight" because the ALJ concluded it was "partly consistent with the record," which indicated that Plaintiff had Meniere's disease or vestibular migraines and that she complained of vertigo and difficulty balancing. (Tr. 24.) The ALJ incorporated into the RFC Dr. Kwiatowski's opinion that Plaintiff should avoid unprotected heights, "exposure to hazards," and moving machinery. (Tr. 18.) Plaintiff asserts that the ALJ implicitly rejected Dr. Kwiatowski's opinion that Plaintiff had attacks of dizziness five times a day of up to five minutes in duration that required her to rest. (Doc. 16 at 12.)

The parties seem to disagree about whether Dr. Kwiatowski's indication that Plaintiff had attacks of dizziness that occurred about five times a day and that required Plaintiff to rest throughout the day should be considered a cause of the limitations that Dr. Kwiatowski identified on the second page of his assessment (restrictions from working around unprotected heights, hazards, and moving machinery) (*see* Doc. 17 at 7 (the Commissioner's apparent position))[7] or whether it should be considered a separate opinion. (*see* Doc. 16 at 12 (Plaintiff's position).) If Dr. Kwiatowski's assessment is interpreted in the manner that the Commissioner suggests, then no error occurred because the ALJ incorporated the limitations that he assessed (restricted from working around unprotected heights, hazards, or moving machinery) into the RFC. (*See* Tr. 18, 24.) If Dr. Kwiatowski's opinion is interpreted in the manner Plaintiff suggests, then the ALJ

---

[7] The Commissioner asserts that "because" Dr. Kwiatowski found that Plaintiff had symptoms of dizziness and vertigo due to her Meniere's disease or migraines, Dr. Kwiatowski concluded that Plaintiff was "completely restricted" in activities involving unprotected heights, moving machinery, exposure to marked changes in temperature and humidity, and exposure to driving, dust, fumes, and gases. (Doc. 17 at 6-7 (citing Tr. 688).) The Commissioner asserts that the RFC incorporated these restrictions and, therefore, the ALJ did not err. (Doc. 17 at 7.) Plaintiff does not challenge the ALJ's assessment of Dr. Kwiatkowski's opinion as it relates to these restrictions. (Doc. 16 at 12-13.)

erred by failing to explain her implicit rejection of Dr. Kwiatowski's opinion that Plaintiff's dizziness attacks, which occurred up to five times a day and lasted up to five minutes, required her to rest.

The Court does not resolve the issue regarding the interpretation of Dr. Kwiatowski's assessment because Plaintiff testified to symptoms that are similar to those in the statement at issue in Dr. Kwiatowski's assessment—that she had dizziness attacks four to five times per day that require her to rest for twenty to thirty minutes. (Tr. 50.) As discussed below, the Court concludes that the ALJ erred in discounting Plaintiff's symptom testimony.

### C. Plaintiff's Symptom Testimony

Plaintiff asserts that the ALJ erred by failing to provide clear and convincing reasons for discounting her symptom testimony. (Doc. 16 at 18-21.) The Commissioner defends the ALJ's assessment of Plaintiff's symptom testimony. (Doc. 17 at 13-17.) As discussed below, the Court finds that the ALJ erred by rejecting Plaintiff's symptom testimony without providing clear and convincing reasons for doing so.

An ALJ uses a two-step analysis to evaluate a claimant's subjective symptom testimony. *Garrison*, 759 F.3d at 1014 (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen*, 80 F.3d at 1282. Instead, the claimant must only show that an objectively verifiable impairment "can reasonably produce the degree of symptom alleged." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable

inference, not a medically proven phenomenon"). Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms limit the claimant's ability to work. *See* 20 C.F.R. § 404.1529(c)(1). At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for discounting the symptom testimony. *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). Plaintiff argues that the ALJ did not provide clear and convincing reasons for rejecting her symptom testimony. (Doc. 16 at 24.) As set forth below, the Court concludes that the ALJ erred by discounting this testimony.[8]

As noted in the ALJ's decision, Plaintiff reported that she was unable to work because of dizziness, Meniere's disease, and back pain. (Tr. 49.) Plaintiff testified that she had attacks of dizziness up four to five times per day that required her to rest for twenty to thirty minutes. (Tr. 49-50.) Plaintiff also testified that she had pain in her neck, shoulders, lower back, and pain that radiated into her left leg. (Tr. 53.) To relieve her pain, Plaintiff sat in a reclining chair intermittently throughout the day for twenty to thirty minutes at a time. (Tr. 53-54, 55.) As discussed below, the ALJ rejected Plaintiff's symptom testimony as inconsistent with her daily activities and as inconsistent with the medical record. (Tr. 19-22, 24.)

///

///

---

[8] The Commissioner objects to the clear and convincing standard but recognizes that the Ninth Circuit continues to apply this standard. (Doc. 17 at 14.)

- 17 -

### 1. Plaintiff's Activities

An ALJ may reject a claimant's symptom testimony if the severity of the alleged symptoms is incompatible with the claimant's daily activities. *See Burch*, 400 F.3d at 681. Daily activities may also be "grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

The ALJ noted that Plaintiff could care for others and her pets, "prepare meals, do dishes, fold laundry, shop in stores, count change, handle a savings account, and use a checkbook or money order." (Tr. 19.) Plaintiff also "spent time with others, watched television, talked, and texted." (*Id*.) As Plaintiff argues (Doc. 16 at 20-21), her daily activities are not a clear and convincing reason supported by substantial evidence for discrediting her symptom testimony. The ALJ did not make any finding as to how often Plaintiff engaged in these activities or whether these activities were transferrable to a work setting. (Tr. 19, 24.) Additionally, the ALJ did not explain why the cited daily activities were inconsistent with the severity of Plaintiff's reported symptoms. (*Id*.) Accordingly, Plaintiff's daily activities were not a legally insufficient reason for discounting her symptom testimony and the ALJ erred by discounting Plaintiff's symptom testimony on the basis of her daily activities. *See Trevizo,* 871 F.3d at 682 (finding that ALJ erred by relying on claimant's childcare activities to discount the severity of claimant's symptoms when there were no details regarding those activities).

### 2. Objective Medical Record

The ALJ discounted Plaintiff's symptom testimony because she also found that Plaintiff's "allegations" were not supported by the objective medical evidence. (Tr. 24.) Instead, the ALJ found that the "objective medical evidence" supported her RFC assessment. (*Id*.) Before reaching that conclusion, the ALJ cited the medical treatment evidence related to Plaintiff's impairments. (Tr. 23-24.) Plaintiff argues that the ALJ erred by discounting her symptom testimony on this basis. (Doc. 16 at 20.) The Commissioner

defends the ALJ's decision. (Doc. 17 at 14-16.) However, the Commissioner recognizes that once "a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate" the claimant's allegations. (*Id*. at 15 (citing *Burch*, 400 F.3d at 680-81); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (same). Here, the ALJ specifically found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." (Tr. 19.) Therefore, because the ALJ did not provide any other clear and convincing reasons for discounting Plaintiff's symptom testimony, the ALJ erred by rejecting Plaintiff's symptom testimony based on her conclusion that the objective evidence did not support that testimony.

**VII. Remand for an Award of Benefits**

Under the Ninth Circuit's credit-as-true standard, courts may credit as true improperly rejected medical opinions or claimant testimony and remand for an award of benefits if each of the following conditions is satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020 (citing *Ryan*, 528 F.3d at 1202). If the "credit-as-true rule" is satisfied, the court may remand for further proceedings, instead of for an award of benefits, "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021.

As detailed above, the Court the ALJ erred by rejecting Dr. Janikowski's opinion and Plaintiff's symptom testimony and consequently failed to incorporate the limitations that Dr. Janikowski and Plaintiff identified into the RFC. The ALJ concluded her analysis at step four by finding that Plaintiff could perform her past relevant work and did not reach step five. When the testimony of a vocational expert has failed to address functional

limitations that are established by improperly discredited evidence, the Ninth Circuit has "remanded for further proceedings rather than payment of benefits." *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) (citation omitted). Thus, the Commissioner asserts that further proceedings are necessary because the VE did not testify about whether Plaintiff could perform other work in the national economy. (Doc. 17 at 18.) However, in this case, the VE considered the functional limitations established in the improperly discredited evidence and testified that "all work," not just Plaintiff's past relevant work, would be precluded for an individual with limitations established by Dr. Janikowski's assessment and Plaintiff's symptom testimony.

Specifically, the VE testified that "all work" was precluded for an individual who, consistent with Plaintiff's testimony, had to rest "5 times a day or so" for periods of fifteen to twenty minutes. (Tr. 49-50, 71.) The VE also testified that "all work" would be precluded for an individual who, consistent with Dr. Janikowski's opinion, could sit for less than three hours and stand or walk less than two hours in an eight-hour day. (Tr. 71, 1002, 1095.) Thus, according to the VE's testimony, if Dr. Janikowski's opinion and Plaintiff's testimony are credited as true, Plaintiff would be disabled under the Act. Because the VE considered the functional limitations assessed in the improperly discredited evidence, further proceedings are not necessary. Additionally, the record does not create serious doubt as to whether Plaintiff is disabled under the Act. *See Garrison*, 759 F.3d at 1021.

Accordingly,

**IT IS ORDERED** that the Commissioner's decision is **REVERSED** and this matter is remanded for a determination of benefits.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Plaintiff and terminate this case.

Dated this 23rd day of January, 2019.

_____
Bridget S. Bade
United States Magistrate Judge